Morning, Your Honor. James Shawboy for Appellants Donald and Janet Metcalf. This is one of three appeals. We submit that this appeal and the appeal that will come after this have one overriding issue that should be kept in mind as the Court determines the merits of both appeals and that is the recusal motion. There was a recusal motion filed in the bankruptcy court after the second reversal of the bankruptcy court's tentative ruling with respect to two dispositive motions that had been filed in the bankruptcy court. Wait a second. This particular issue doesn't have anything to do with the recusal motion that you're arguing right now, right? We're looking at 0555158. Which one are you doing? Oh, he didn't make it. I would ask the panel to keep in mind the recusal issue in the matter following this one. I believe that's important because in this case, the trustee filed the preference action to recover the $20,000 that was paid within 90 days of bankruptcy. We submitted evidence that the payment was not from the debtor, was not part of the debtor's estate, but in fact came from a third party, passed through the debtor, and then was paid to Mr. Metcalf in satisfaction of the judgment. The initial tentative ruling of the bankruptcy court was that a tribal issue of fact existed as to the earmarking of these funds, that they may not have been part of the debtor's estate, and that the matter should submit to trial. After the tentative ruling, there were ex-party contacts. But that's the other case, right? That's the other case. Are you going to argue that case now? No, I'm just Are you arguing both cases? I am. Okay. May as well do both. Yeah, why don't we? I believe the point that you're making is that that somehow infected this ruling, too. The problem is that issue isn't presented in this case. That's exactly right, Your Honor. Okay. So this case has got some wrinkles of its own. So maybe you can explain, putting aside the tentative ruling, we're looking, we review final rulings. So looking at the final ruling, why is it wrong, given the fact that there is nothing to show a direction by Asante or however it pronounces itself, that these funds go where they went? Well, we believe at the summary judgment stage, there are facts which would raise a reasonable inference that there was, in fact, a direction by Asante that these funds go through Adbox directly to Metcalfe in order to stave off Metcalfe's foreclosure of his security interest in the Adbox stock. Ernsthoff admits that Werner Dahl came to him and asked him for this judgment. He knew that the funds he gave to Werner Dahl would be used to pay this judgment. The fact that they went through a series of convoluted transactions before they actually got to Metcalfe, we think that some of them could have gone to anybody. Well, that's true. It could have gone to anybody. But at the summary judgment stage, we contend that the undisputed facts that he knew these funds were going, these funds were requested to pay Metcalfe. He knew they were going to pay Metcalfe. And for the counsel, that's not really the standard, isn't it? Don't you have to show that there was an agreement that the funds must be used to pay your client, the obligation owed to your client, do you not? Correct. Where in the record is that shown? Well, at the summary judgment stage, we believe we had submitted evidence that Ernsthoff was aware the loan was needed to pay the debt, that there was a direct flow of the funds from Ernsthoff to Adbox to Metcalfe, and that the only reason he gave them to Adbox and Werner Dahl was to pay off the Metcalfe judgment. But there was no evidence. I mean, again, the key here is there had to be an agreement that it must be used for that. And I'm asking you, where in the record does that show? I know there was some supposition and suggestion that that may have been the case, that you said that. I know the other party said the contrary. But in order to establish what you're trying to establish, you have to show the agreement and that it had to be used that way. I don't find anything in the record that shows that. Where am I missing something? Well, there was no written agreement. Okay, let's say there's no written agreement. Tell me the oral agreement that everybody agrees upon that said, here's the agreement, and it had to be used, the money had to be used to pay your client. Where does that show in the record? Well, again, we believe that you have to pull in the different facts we've submitted that we have at this point. Again, we're at the summary judgment stage. I understand that. But a lot of cases are dismissed at summary judgment level. Each party has certain obligations. In order to succeed, to raise the tribal issue of fact, you have to show, you have to make it show, a prima facie showing that there was an agreement, the money was going to be put into ad box to pay your client, and that the funds had to be used for that. I don't see that in the record. And I'm asking you, where is it? Well, Your Honor, if I might, I submit at this point, I think we have to show that there's a tribal issue of fact, whether there was. You have to make a prima facie showing that if you, that would raise the tribal issue of fact, so that if you went back. But you've got to make a prima facie showing. I believe we have on the facts I've enunciated. Let me ask you a question. You say that one of the facts that support, and you want us to have sort of an inference that there was an agreement, but one of the facts is that it was to ward off the foreclosure by net cap based on the judgment, that you only paid him $21,000, and wasn't he also entitled to an additional $600 something in attorney's fees? And couldn't he have nevertheless foreclosed on that basis? No, because the attorney's fee obligation was a subsequent obligation after the agreement establishing the security agreement. The $20,000 was the tail end of the amount that Werner Dahl agreed to pay for the business. Right, but that was found after it went up to the Court of Appeals, and the Court of Appeals. But the, well, the attorney's fee award was an amount, well, it wasn't secured by the ad box stock. There was no agreement by the parties that an award of attorney's fees would be secured by the ad box stock. The agreement between the parties was that the purchase price of the business, $315,000, of which the $20,000 was the last amount that had to be paid, would be secured by the ad box stock. If there was litigation arising out of the transaction selling ad box, the prevailing party would be entitled to attorney's fees, and conceivably he could go after the ad box stock, but it wouldn't be, that obligation wouldn't be secured by the ad box stock. So, in response to your question, we submit that the sequence of events leading up to the payment of the $20,000 by Ernatov to ad box, to the lawyers, and eventually to Metcalf, raises the inference that there was an agreement, because there was two- side agreement, but you have not pled or shown that there was an agreement. As you know, counsel, you had a bankruptcy situation. You're going out of the normal course here. Normally when something goes into a bankrupt estate, it's subject to the bankruptcy trustee and all the other controls. The only way it gets out where it can flow through directly is if there is an agreement that that's what it's going to do, and it must be used for that. No other way. Inferences don't work. You've got to have an agreement, and I don't see that pled, and I certainly don't see a prima facie case of that in the record. If you can correct me, I'd love to have you do that so I can get my mind straight on it, but I don't see that in the record. Well, the district court found that we showed the first two elements, that Ernatov was aware the loan would be used to pay the debt, and that there was a direct flow from Ernatov to Advox to Metcalf. They said that the district court... The numbers were not the same, though, were they? The numbers that went to different places, they were used for other things. The money was not all paid to your client. Some of the money that was paid in was used to pay other obligations. I don't know if there's any evidence about that. I don't know. We haven't submitted any evidence that the $18,000 that went into the account was taken out of the account, and in fact, Mr. Warnerdahl's wife testified to that, that the $18,000 was used to pay the Metcalf obligation. The district court found that the motive for Exenta to enable Advox to pay, the evidence on that issue was weaker than on the other two issues establishing an agreement. We submit at the summary judgment stage, the district court erred in balancing the evidence instead of just considering if there was any evidence in support of that issue. Okay. Thank you. Ms. Goldberg. Good morning, Your Honors. Kathleen Goldberg of the Law Office. This is Thomas H. Casey representing Jeff Golden, who is the trustee in this matter. I'm sorry for my voice this morning. With regards to the summary judgment order, there was no facts in dispute, and it was only for the purposes of this particular summary judgment motion that the trustee accepted that the other monies deposited by Exenta, or allegedly deposited by Exenta in the amount of $19,500, was actually deposited. Exenta does not agree with that. The district court talked about the two different deposits, but I just wanted to make sure that you understood that Exenta disputes that there was any money deposited by them on June 26, 2002 into the debtor's account. So that is just for the purposes of this motion. We agreed to allow that issue just to go by the wayside. But it does show that there really wasn't any agreement. Also, at the bankruptcy court level, we were dealing with the standards that are under the lease. Do you want some water? No, I'm fine. The Kemp and the Superior Stamp and Coin cases, and we were arguing about control and whether Exenta and Robin Whitburn, who was the wife of the principal of the debtor, had any control over the funds that they deposited into the debtor's account. And they specifically filed declarations, testimony under oath that they had no control, that there was no agreement, and there was absolutely no basis for the earmarking defense. But even stepping back before that, there's the aspect of whether they waived the earmark defense. Whether this is a defense or a principal is something that is of issue. Under the Lee case, the earmarking doctrine is considered a court-made defense to a preference action. And pursuant to Federal Rules of Civil Procedure 8A and C, all affirmative defenses must be asserted in the answer, are they deemed waived. Do you have any authority, Ms. Golden, that, at least in this circuit, that earmarking is an affirmative defense, and therefore not waived, or rather waived if not applied in the answer? In the Henry Lee case, 179BR149, it's a Ninth Circuit BAP case. And so the district court chose not to follow that case, because it held that it was not bound by the BAP case. But the bankruptcy court was bound by the BAP case. But we kind of all skipped right past and went on to the fact that there was no facts in support of the earmarking defense, and we really didn't go through the initial element that he waived it. He didn't file it in the answer. There was nothing with regards to that. We also had discussions about the burdens of proof in the earmarking defense, whether it is initially the burden of proof of the trustee to prove that it was property of the or whether it's the burden of proof of the other side to show that it was not, that it was earmarked funds. And the bankruptcy court went through one analysis while the district court went with another. However, both instances, since the money flowed through the debtor's account, there was a presumption that it was the debtor's property. So we have really no concern that the required elements of the earmarking defense, regardless of who had the burden of proof, initial burden of proof, or who, what presumptions exist. It has both the trustees been successful in allocating that there was no earmarking defense. What wasn't discussed by Mr. Shalvoy was the order dismissing the counterclaim. In response to the trustee's preference complaint, the Medcaps filed a counterclaim against the trustee for tortious interference with prospective economic advantage, violation of the Civil Code Section 3439, and conspiracy. In this, he alleged that the debtor's assets, the total of the debtor's assets, was part of... Do you have real questionnaires whether the district court got it right that the trustee in his trustee capacity wasn't the right party to sue? Right? I have, yes. I'm not at all questioning that. My only point is that as a counsel for trustees on a regular basis, that it not be lost on this court that the trustee's ability to really that complaint should have gone through the claims process instead of having a complaint against the trustee in his representative capacity as the debtor, representing the debtor. How do you file a claim that would have brought up these issues? You just file the claim, and you file it as a complaint. You say this is the amount owed. You can take the claims form and put the number right there and attach your allegations. It is deemed allowed until it is objected to. And by going through the claims process that way, you're allowing a trustee to use his business sense in determining whether it's worthwhile for this bankruptcy estate to object to that claim or not. It could be just deemed allowed and say that's it. By having a creditor... The claim can, in effect, be a lawsuit? Yes, it may. Unliquidated? Unliquidated. And it is deemed allowed until objected to. In this instance, this complaint was filed after the claims bar date. So that's another issue is that when you have the claims process, you have a very short time period in which to file a claim. And so the trustee has an opportunity to find out what are the claims against this bankruptcy estate. And things aren't dragged out and you don't have to wait for these long statute of limitations on different causes of actions to run. The trustee can administer the case immediately. But also you leave it up to the trustee to determine whether it is even worthwhile to object to this claim or not. In this instance, given that there was not very many assets in this bankruptcy case, that there probably wouldn't be a distribution to unsecured creditors, the trustee wouldn't have even spent the attorney's fees to object to this claim. Let me ask you a question. I know that secured creditors have priority over unsecured creditors. What about a creditor with a judgment? Does that have any special weight or not? No. It's just a liquidated claim. And a phone bill and a judgment have the same value. All right. Thank you. Okay. Thank you. Let's hear the next one, which will require new counsel.
judges: Rymer, Wardlaw, Smith